## E. E. SCOTT MOTOR SERVICE et al. v. SCOTT et al.

No. 23508. Opinion Filed Dec. 20, 1932.

Rehearing Denied Jan. 3, 1933.

Pierce, Follens & Rucker and Fred M. Mock, for petitioners.

Ted R. Moore, Mark B. Ingle, J. Berry King, Atty. Gen., and Robert D. Crowe, Asst. Atty. Gen., for respondents.

KORNEGAY, J. This is a proceeding to review an award of the Industrial Commission which is, in part, as follows:

"1. That the claimant herein, on and prior to May 8, 1931, was in the employment of the respondent and engaged in a hazardous occupation covered by and subject to the Workmen's Compensation Law.

"2. Arising out of and in the course of his employment, the claimant, on May 8, 1931, suffered an accidental personal injury to pelvis accompanied by extensive contusions and bruises, as a result of which he was temporarily totally disabled from the date of said injury to August 28, 1931.

"3. That the average daily wage of the claimant at the time of said injury was $6.50 per day, making his compensation rate the sum of $18 per week.

"The Commission is therefore of the opinion: Upon a consideration of the foregoing facts, that the claimant is entitled to compensation for temporary total disability from the date of said injury, to wit, May 8, 1931, to August 28, 1931, less the statutory five-day waiting period, at the rate of $18 per week, or for a total period of 15 weeks and 3 days, or the total sum of $279, which is now due, and should be paid in one lump sum.

"The Commission is further of the opinion; That the respondent and insurance carrier, having failed and refused to furnish proper medical care, that they are liable for all reasonable and proper medical care and doctor bills, and that the charge of Dr. Neil W. Woodward, Osler Medical Building, Oklahoma City, Okla., in the sum of $45 is a fair and reasonable charge, and should be paid by said respondent or its insurance carrier.

"It is therefore ordered: That the said respondent, or its insurance carrier, within 15 days from this date, pay the sum of $279, the same compensation for the temporary total disability suffered by the claimant from May 8, 1931, to August 28, 1931, less the 5-day statutory waiting period, all in one lump sum.

"It is further ordered: That the respondent or its insurance carrier within 15 days from this date pay to the said Neil W. Woodward, the sum of $45 for medical services herein.

"It is further ordered: That within 30 days from this date, the respondent or its insurance carrier file with this Commission proper receipt or other evidence of the compliance with the terms of this order."

An inspection of the record shows that, on September 21, 1931, there was received by the Commission a claim by E. E. Scott for injury as an employee, against himself and L. G. Rhodes, as the respondents, doing business as the E. E. Scott Motor Service, a partnership. This was signed on the 18th of September, 1931, and stated that the accident occurred near Weatherford, arising from a collision between an automobile driven by the claimant, and the approach to a bridge on a highway, about seven miles east of Weatherford, Okla., and that the accident occurred on the 8th of May, 1931, and he returned to work on the 13th of August, 1931.

On September 25, 1931, the employer's first notice of injury was given by the same party, as a partner, and the duties being performed were given as driving car to Amarillo, Tex., and his occupation was that of an automobile mechanic. The attending physician's report was filed on the 20th of November, 1931, and the cause of injury, as given in the physician's report was, "Car skidded and auto wrecked and pinned patient between bridge and car."

An answer was filed purporting to be on behalf of respondent, and the insurance carrier, denying generally and specifically every allegation contained in the claim, and denying the accidental injury, and averring that if the injury was actually received, it did not arise out of and in the course of his employment with the Scott Motor Company, and further statement is made of denial of being engaged in a hazardous occupation within the meaning of the Compensation Law.

The evidence was taken of the doctors, showing the injury and the acts of the injured party, together with a report to

the insurance carrier of the condition of the injured party, and the doctor bill, which appears to have been addressed to the claimant himself, and at page 29 the claimant himself testified that he was working for a partnership "between me and a fellow, name of L. G. Rhodes," and that each received wages just like the other fellows, the wages of himself and partner being $50 a week, and he testified as follows:

"Q. Other men working for the E. E. Scott Motor Service? A. Yes, sir; had three mechanics and porter. Q. Three mechanics, besides yourself and Rhodes? A. Yes, sir; and the porter. Q. How were they paid? A. Porter was paid on a salary and the mechanics were working on a percentage basis of earning capacity, repairing."

His further testimony as to there being anything left was as follows:

"A. Rhodes and I would split the profits in addition our salary."

Testimony was offered as to what was in the shop as to power driven machinery. His testimony concerning the particular car is as follows:

"A. That car had been in storage in the garage approximately seven days; it came here from another state and it belonged to the Commercial Credit Company and I kept their cars and I had to deliver that car to Amarillo and that day I greased it and checked it over and got ready for the trip and it was set aside ready for me to deliver it and I couldn't get away and done other work in the shop and set it aside and then I got in this car and left town. Q. What time of day? A. Nine-thirty or ten, I don't remember exactly the time. Q. What happened next? A. Well I was going to Amarillo to deliver this car to the insurance—to the Commercial Credit Company of Amarillo, and it was a paved road and everything was all right and the car was apparently all right and everything was all right and the tires were pretty fair. I was along this stretch of road where this road got almost to the river. It was a dirt road and I was going between 45 and 50 miles an hour this side of Weatherford. Generally I knew the road pretty well and a fellow came up the hill and his lights didn't blind me or anything, but when he came up the hill and where you start down the hill your lights shine on the next hill and while running about 50 miles an hour the left front wheel dropped down in a hole—Q. Gravel road? A. Dirt road."

He described the details of the accident, and about his being picked up by a boy, described by him as being "the boy worked for me was following me to return after I delivered this car he was to meet me in

Amarillo." He detailed his return home to Oklahoma City, after being hurt, and calling Dr. Woodward as his physician, and that he returned to work on the 1st of September, 1931, as a mechanic for Paris-Cope-Graham, Inc., at $125 a month, and proof was made as to difference in receipts before the accident and afterwards, as a result of wages earned. He did not know the date exactly when he asked the agent of the insurance company about his compensation, and he asked the insurance company to get the policy and get him straightened out and pay the doctor bills, and the insurance company refused to pay the compensation. The agent's name was Medley & Company. Over objections he testified concerning the usual practice of the Scott Motor Company to deliver cars after performing mechanical work on them, and he would take them any distance within a distance of 300 or 400 miles, and that he was paid for delivering this car and expenses incurred on the trip, and that the Scott Motor Company returned the credit company a bill for the expenses and repair.

On cross-examination he stated that he had not overhauled the car or anything like that. His testimony as to the trip to Amarillo is as follows:

"A. I don't believe I asked him to pay me to take it down there; no, I know I didn't; I told him I would deliver the car and deliver it if he would take care of all expenses and that was agreeable. Q. And the only thing you were paid for was expenses of the automobile and greasing it? A. Yes, sir. Q. And for medical bill; they paid your medical bill? A. They spent quite a bit of money with me for repossessed cars and I agreed to do it."

He stated that he wanted to see a man who owed him at Amarillo, and that the bill he wanted to collect was a personal bill. He stated that when he took out the insurance, he had three mechanics and a porter, and the mechanics averaged from $30 to $35 a week in earnings, and the porter received a salary of $15 a week.

On cross-examination it developed that the car was merely stored, and not brought to the garage for the purpose of repair, and it appears that the work performed on it was servicing it and looking it over for the journey. His testimony, as disclosed by the record, is as follows:

"Q. Now, you said the morning before you left you had it greased? A. Serviced it and looked it over. Q. Like you check over any automobile before you start on a trip? A. Yes, sir. Q. You hadn't overhauled this car or anything like that? A. No, sir. Q. How did you happen to take

this car to—A. Amarillo? Q. Yes. A. Well, Mr., I believe Mr. Glover, said that car had to go to Amarillo, Tex., and I told him I would take it."

And he further testified:

"Q. And after you had explained you wanted to go there and collect these bills? A. I didn't beg him to let me go, merely volunteered to him to let me go to save sending their own men and I thought that would be a nice way to treat my customer. Q. And you had these bills to collect and had a double purpose? A. That was a personal matter of mine, it was a matter of me or my own in delivering that car to a certain town and if I wanted to take two days to come back that would have been perfectly all right."

And the court, referring to the employees, says:

"The Court: He has already stated in addition to himself and the porters he had three mechanics and a partner."

He detailed the wages they were being paid. He stated he could not remember whether he listed himself as a partner or not, and that before he had a partner he averaged $50 more or less, and the question came up of his partnership agreement and request for it, but it seems never to have been introduced. He was questioned as to whether the policy showed he was listed as drawing $50 a week wages, and the court stated that the policy did not state. The policy does not appear in the record, but there is a statement made by Mr. Covington, as follows:

"The policy covered E. E. Scott and L. G. Rhodes doing business as the E. E. Scott Motor Service and followed with a list of employees and rating. I haven't actually seen the policy."

Being interrogated about the custom of the garages in town about delivering the cars that were brought there for washing and greasing, we find the following:

"Q. Now, you stated something about the custom in garages in town delivering? A. Yes, sir. Q. When they did that that was purely as a mere gratuity—strike that—these garages and service men all pick up and deliver cars in town where they want to wash or grease a car? A. Yes, sir; lots of them do. Q. They don't go 15 or 20 miles in the country? A. I should say so. Q. To wash and grease it? A. Not to wash and grease it. Q. Or to store it? A. That all depends on how long they wanted the car to stay in storage. I have sent to other towns and got automobiles for storage. Q. They paid you for that storage? A. Yes sir."

In describing why he went to the employ of the Paris-Cope-Graham Company, he stated:

"The Court: Now, why didn't you return to the employ of the E. E. Scott Motor Service instead of going to Paris-Cope? A. For the simple reason I had a partner, a single boy, didn't have a family or anything, and had a new automobile and didn't take care of my business. While I was laid up he spent the money and was broke and we didn't start on a lot of money and he went through everything we had. The Court: Now, you closed the business of the E. E. Scott Motor Service before you returned to work September 1st? A. Yes, sir. The Court: All right. A. I was unable to look after the business and he was incompetent to run it. The Court: Do you know when you closed the business of the E. E. Scott Motor Service? A. July, I believe. The Court: That's all."

Part of the examination made by his attorney and by the court was rather suggestive. He stated that the rate of storage was 25c a day. There appears in the record what is classed as respondent's exhibit No. 1, which is a statement of account for 5/27/31, which is as follows:

"E. E. Scott Motor Service Phone 7-4212
"Repairs—Storage Washing—Greasing.
"407-9 W. Eighth St.
"Oklahoma City, Okla.

"Commercial Credit Co.
"Hightower Bldg.

"Preserve this statement as we render only one bill of itemized account.

"Interest charged on account over 30 days old.

"Form 34 B. Norick-Printers, Okla. City.

"Statement of Your Account for 5-27 1931.
"Balance from Previous Months

"Date    Item    Charges    Credits    Balance
Balance from previous months

| 1 Storage on Plymouth Roadster | |
|---|---|
| 5-4 to 5-8 | $ .80 |
| 10 gal gas | 1.10 |
| 2 qts. oil | .60 |
| 2 Tires Repairs | 1.00 |
| 1 Tire Repair (El Reno) | .75 |
| 8 Gal gas Weatherford, Okla. | 1.20 |
| Doctor Bill Weatherford | 5.00 |
| | $10.45 |

"The above is a true and certified copy of bill I rendered to the Commercial Credit Company and paid by them in full.
"E. E. Scott.

"Your balance is shown in last column.

"We Appreciate Your Business."

Exhibit B appears to be a liability state-

ment for the quarter from the 2nd day of February, 1931, to the 9th day of May, 1931, which is as follows:

"Form 244

"The Western Automobile Casualty Co. Fort Scott, Kan.

H. O. No. _____

"Assured E. E. Scott Motor Service

"Policy Nos. WC 3347 Sheet No. ____

"Location

"Job or Plant 806-8 No. Hudson, Oklahoma City, Okla.

"Code No.

"Nature of work

"Repairs, filling station

|  | 2 | 1 |
|---|---|---|
|  | Mechanics | Add'l. Help |
|  | 218.54 | 50.00 |
|  | 233.33 | 50.00 |
|  | 244.54 | 68.00 |
| "Totals | 696.41 | 168.00 |

"1st quarterly period 2-9-31 5-9-31

8391 _ 864.41 @ 1.71 _ 14.78

"I hereby certify that above are by classification and total the entire earnings including board, overtime, bonuses and all allowances or remuneration of whatsoever kind paid, allowed or due all persons in our employ during the period of from Feb. 9, 1931, to May 9, 1931

"For payroll of days in a year in excess of 52 weeks or 364 days.

"Signed    E. E. Scott Motor Ser

"By R. B. Cooper."

With this testimony the award in this case was made. Briefs have been filed to sustain it and to attack it. It is attacked upon the ground that the business engaged in was neither insured against nor did it come within the Compensation Law. It is an anomalous situation that Scott claimed that he was liable to himself for the accident that occurred in the manner that he detailed. When one takes the statements that are contained in this record, it is manifestly clear, and in fact admitted, that the risk that Mr. Scott undertakes to throw upon the insurance carrier in this case was not assumed by it.

The work that was actually being engaged in was driving an automobile a long ways from the shop, and to say that it was incidental to a repair shop many miles away,

and therefore came within the provisions of the Industrial Law, would appear to stretch by presumption the structure of the law so as to break it. Evidently no mechanical work, outside of the ordinary work that an ordinary individual would do when he starts on a trip, was ever performed on the car, and the statement of account undoubtedly shows that the thing for which the charge was made, out of which the partner of Scott could hope to get any profit, was storage or some incidental work to a tire.

This court in a recent case, K. C. Auto Hotel v. Caughey, 160 Okla. 204, 14 P. (2d) 1104, had occasion to vacate an award that was given to an employee of a garage, evidently for storage purposes, and not engaged in mechanical or manual labor of a hazardous nature. The syllabus in that case is as follows:

"1. Under the Workmen's Compensation Law, compensation is limited to those employees coming within the terms of the act (Comp. St. 1921, sec. 7284, as amended by the Laws 1923, c. 61, sec. 2), who are engaged in 'manual or mechanical labor of hazardous nature.' The driving of an automobile is not included in the act as a hazardous occupation."

Applying the doctrine of that case to this case, even if there had been a settlement and a payment for assuming the risk, there would be no liability enforceable by the Industrial Commission, even as against the parties that were running the garage and doing the storage. We think there are two insuperable objections to the sustaining of this award that have been mentioned, but when one takes the method pursued in presenting the claim, and adds to it the other defects, it appears that this award is without any foundation in fact that would warrant its making, and that, as the party interested has told the story completely, apparently, this case should be remanded, with directions to dismiss the proceedings.

The award is accordingly vacated, and the matter remanded to the Commission, with directions to set it aside and dismiss the proceedings.

RILEY, HEFNER, CULLISON, SWINDALL, and McNEILL, JJ., concur. CLARK, V. C. J., dissents. LESTER, C. J., and ANDREWS, J., absent.